FILED
CLERK

9:13 am, Mar 03, 2026

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

HESLER ASAF GARCIA LANZA,

                Petitioner,

                v.

KRISTI NOEM, Secretary, U.S. Dept. of
Homeland Security, *et al.*,

                Respondents,

-----------------------------------------------------x

**MEMORANDUM
& ORDER**
Civil Action
No. 26-0029 (GRB)

**GARY R. BROWN, United States District Judge:**

        Petitioner Hesler Asaf Garcia Lanza was granted "Special Immigrant Juvenile (SIJ) status, a Congressionally-enacted program that provides a path to residency and U.S. citizenship."[1]  He had been adjudged by a state court to be a minor who had "been abused, neglected or abandoned by one or both parents, making reunification impossible," qualifying him for this vital legal privilege.[2]  As a result, he earned the right to live and work in the United States pending further processes.  Garcia Lanza embraced this opportunity, living lawfully in the United States, graduating from college with honors and working at a career in theatrical lighting design.

        Then, as part of ICE's recent surge in enforcement efforts, in violation of Constitutional safeguards, statutory guarantees and regulatory restrictions, agents

---

[1]   *In re 21st Birthday Denials*, 637 F. Supp. 3d 23 (E.D.N.Y. 2022); *cf. Bouarfa v. Mayorkas*, 604 U.S. 6, 9–10 (2024) (describing similar "pathway to permanent legal status for a noncitizen" under §1255).

[2]   *Id.*

1

arrested him without a warrant. He was handcuffed, shackled and detained in a facility designed to hold charged and convicted criminals. ICE officers targeted Garcia Lanza for arrest simply because he looked like someone else for whom the agents were purportedly searching. Having discovered their mistake when presented with proof that he had legitimate immigration classification and USCIS work authorization, ICE agents nevertheless continued to detain him. As bureaucratic cover for the arrest, agents completed a post-arrest administrative warrant and then commenced baseless removal proceedings against him. Then, DHS proceeded to revoke the deferred action and work authorization associated with his SIJ status–a reprehensible act of unimaginable cruelty. Even after this Court set the terms and conditions of petitioner's release, ICE imposed additional, unsanctioned conditions upon him, and then DHS imposed a hefty fine to offset the cost of his illegal apprehension.

This isn't how things are supposed to work in America.

Unquestionably, the laws of human decency condemn such villainy.[3] Equally, the laws of this nation, including the Constitution, statutory law and regulations, proscribe the illegal arrest and detention of the petitioner as well as the retaliatory termination, without notice, of the privileges associated with his SIJ status. While the Executive Branch retains the right – as it has done – to set *policy* regarding immigration

---

[3] Several years ago, this Court deemed denial by USCIS of SIJ status based on its erection of senseless bureaucratic barriers "dystopian and cruel." *In re 21st Birthday Denials*, 637 F. Supp. 3d at 26. The actions by immigration authorities here are immeasurably worse.

matters, it is forbidden from trampling our system of laws – a system which has safeguarded this nation for close to 250 years.

Garcia Lanza filed a petition seeking habeas corpus relief under the United States Constitution. The Court held a bail hearing and released the petitioner without ruling on the merits of the petition. The parties have provided additional submissions. Though afforded the opportunity, respondents have not in any way challenged petitioner's sworn assertions, offered evidence from an officer with direct knowledge of the facts or even attempted to explain to the Court why he was placed under arrest.

Worse yet, the problems documented in this case appear widespread.

**Background**

Garcia Lanza, a 24-year-old theatrical lighting designer, immigrated from Honduras at the age of nine. As the Government concedes, in 2022, his application for SIJ status was approved, and he was granted a four-year period of deferred action and work authorization.[4] Docket Entry ("DE") 11 at 15. This determination was based, in part, on a state court order finding that he had been neglected and abandoned by his parents and that he is "unable to return to Honduras." DE 13 at 2-4. He attended NYC College of Technology, graduating *magna cum laude* with a bachelor's degree. [5] He has

---

[4] Concerning the award of SIJ status by the U.S. Government, Garcia Lanza notes "After I went through [the SIJ] process, I finally felt protected. I do not understand how the government that granted me that protection is the same government that is now trying to put me in harm's way." DE 12-1 ¶15.

[5] Garcia Lanza's achievements and reputation in the community have some bearing on the Court's determinations, including the rationale underlying the petitioner's

worked extensively in his field, has no criminal history and never had any interaction with immigration enforcement agents before the events described below.  DE 12-1 ¶1; DE 11-1 ¶3 (ICE acknowledges that this was the "first time ICE encountered Petitioner.").

On January 3, 2026, petitioner was on his way to work when he noticed an SUV with blacked-out windows, driving erratically and following him, leading Garcia Lanza to suspect that he had been targeted for a robbery. DE 12-1 ¶2.  In fact, Garcia Lanza had been targeted.  According to Supervisory Detention and Deportation Officer Jason Langlois, "ICE along with Special Agents from Homeland Security Investigations arrested petitioner while conducting a targeted operation on a third party."  DE 11-1, ¶5.  In other words, Garcia Lanza was *not* the individual the officers were looking to arrest.

Nevertheless, he was soon surrounded by four vehicles and swarmed by a group of immigration agents.  Why?  According to the Government, "Officers visually observed petitioner and believed him to match the description of the third party."  DE 11-1 ¶5.  Asked if he had a "green card," Garcia Lanza provided his U.S. Work Authorization card, which an agent seized from him.  DE 12-1 ¶¶2-3.  That card, valid until November 3, 2026, states that he "is authorized to work in the U.S. for the validity

---

release on bail from ICE custody.  Simultaneously, these undisputed facts demonstrate that his arrest is inconsistent with the express purposes behind heightened immigration enforcement, purportedly aimed at criminals and other dangerous individuals.

of this card." DE 1-1 at 7. It also demonstrated to the agents that they had seized the wrong person.

The officers surrounding Garcia Lanza took his picture, examined his USCIS Work Authorization Card, and then, according to petitioner, "seemed unsure what to do with me." DE 12-1 ¶4. He heard one officer ask "What do we do?" to which the officer holding his identification responded "We're going to take him with us anyway." *Id.* He was handcuffed by the officers, patted down, surrendered his property and placed in a vehicle with another arrestee. *Id.* ¶5. Garcia Lanza reports that he was arrested in an area in which the residents are principally Latino and Black and that the officers initially tried to communicate with him in Spanish. *Id.*

He was taken to the Hempstead Armory, where he and another detainee were shackled. *Id.* At this point, he observed one of the officers complete an administrative warrant of arrest for his apprehension, which the officer showed to his stepfather who arrived at the scene. *Id.* ¶6-7. His stepfather snapped a picture of the administrative warrant, signed by an immigration officer, which states that "the subject either lacks immigration status or…is removable under U.S. immigration law." DE 1-1 at 2. While the timeline differs slightly, a supervisory ICE officer admits unabashedly that officers apprehended petitioner without an administrative warrant, executing it only after his apprehension. DE 11-1 ¶5.

Similarly, ICE purportedly commenced removal proceedings against him that same day by preparing a Notice to Appear which charges that he is removable because he was "an alien present in the United States without being admitted or paroled." DE

12-1 at 11. That document was unquestionably prepared after his arrest by ICE. Garcia Lanza avers that he was not provided with the NTA; rather, an officer named Rodriguez "did not give me a chance to read the documents before they told me to sign them." DE 12-1 ¶10. In fact, via a document entitled "Notice to EOIR," (Executive Office for Immigration Review), Officer Rodriguez certified that Garcia Lanza had been detained by ICE and had been transferred to the MDC (which was untrue), but did not mark a box indicating that "[a] charging document has been served on the respondent," corroborating Garcia Lanza's statement that he was not served with the NTA. DE 12-1 at 16. Evidently prepared in a slapdash fashion, the document reads, in part, as follows:

> You were not then admitted or paroled after inspection by an Immigration Officer.ORAt that time you arrived at a time or place other than as designated by the Attorney General.

*Id.* at 11 (errors as original). It also states, as required by law, that "[a] list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice." *Id.* at 12. No such list was provided.

Petitioner was then taken to the Nassau County Correctional Center ("NCCC"). DE 12-1 ¶8. His attorney filed the instant Petition on January 4. Petitioner was held at the NCCC under suboptimal conditions until this Court's bail hearing on January 5, in which petitioner participated telephonically from the NCCC. *Id.* ¶16. The Court ordered his immediate release on personal recognizance with specified conditions. Electronic Order dated 1/5/26; DE 5 (written order specifying release conditions). He was held for several more hours until his clothes were returned to him, and an ICE

officer picked him up, advising petitioner he should "learn from this and to use this to grow and become a better man." *Id.* ¶17.

Without authorization from this Court, and in contravention of its Order setting the terms of his release, ICE imposed a phalanx of additional conditions upon Garcia Lanza. DE 12-1 at 21-23. These included "successful participation" in Homeland Security's "Alternatives to Detention Program," which rendered him "subject to electronic monitoring [and a] curfew" after being fitted with a "GPS tracking ankle bracelet," and conditions relating to complying with "prescribed doctor's orders," adding that "any violation of these conditions may result in you being taken into ICE custody and you being criminally prosecuted." *Id.* It also required him to check in with a duty officer at ICE's CART kiosk periodically beginning on January 19, 2026. *Id.*

At the check-in on January 19, ICE returned petitioner's phone and wallet. DE 12-1 ¶19. The officials did not, however, return his work authorization card, advising that it has been sent to Virginia. *Id.*

In a letter dated January 26, 2026 – weeks after his arrest, the filing of the instant habeas petition, and his release on bail by order of this Court – USCIS advised the petitioner, for the first time, of the following:

> **Termination of Special Immigrant Juvenile Deferred Action**
> This letter serves as notification that U.S. Citizenship and Immigration Services (USCIS) has individually reviewed your case and exercised discretion to terminate your period of deferred action, which began on November 3, 2022 in connection with your approved Form I-360, Petition for Amerasian, Widow(er) or Special Immigrant Juvenile (SIJ). USCIS approved your Form 1-360, which granted you SIJ classification on November 3, 2022, and it remains approved.

> Deferred action is a discretionary determination, however, to defer immigration enforcement action against an individual as an act of prosecutorial discretion. You may not appeal or move to reopen/ reconsider this decision.

DE 12-1 at 43.  That same notice further provides notice that USCIS intends to revoke his work authorization in 15 days on the grounds that his deferred action had been terminated.  *Id.* at 43-44.  "I fear I will lose my job because of this," Garcia Lanza notes. DE 12-1 ¶20.  The letter, the only notice provided to petitioner of this dramatic action, bears solely a pixelated reproduction of the signature of an "Acting Director" of the USCIS National Benefits Center.  DE 12-1 at 43-44.

The Department of Homeland Security had yet one more indignity to visit upon Garcia Lanza.  The documents that were prepared but *not* served by Officer Rodriguez upon petitioner included a "Notice of Fee Assessment," reflecting that he had been "apprehended by the U.S. Department of Homeland Security between ports of entry," such that DHS was imposing a fine of $5,130.  DE 12-1 at 18-19.  This document was purportedly served upon petitioner while he was detained at the NCCC.  *Id.*

"Since I was detained, I have been afraid to leave my house.  Every time I walk to the train to go to work," Garcia Lanza reports, "I get an immense amount of anxiety.  It terrifies me to know that ICE agents can take me at any moment again.  Once I arrived in the United States as a young boy, I thought my days of living in fear were over. It saddens me to realize they are not."  DE 12-1 ¶21.

In his petition, Garcia Lanza asserts ICE's actions constitute statutory and regulatory violations and violate his rights to procedural and substantive Due Process under the United States Constitution.

This opinion follows.

**Discussion**

*ICE was Unauthorized to Arrest and Detain Petitioner and the Post-Arrest Issuance of an Administrative Arrest Warrant and Notice To Appear Does Not Validate these Unlawful Acts*

For avoidance of doubt, at no time did an ICE officer obtain a judicial arrest warrant – requiring a demonstration of probable cause for the arrest to a detached, independent judicial officer – the procedure envisioned by the U.S. Constitution. Rather, the officers resorted to the expedient of a Government form, an I-200 administrative arrest warrant, authorized for use by immigration enforcement officers only under carefully proscribed circumstances. Those circumstances are extremely limited due to the extraordinary nature of this process – it allows arresting officers to issue their own warrants – a rare exception to the traditional practices in American law. U.S. Const. Amend. IV; *cf. Walker v. City of Birmingham*, 388 U.S. 307, 320–21,(1967) ("[I]n the fair administration of justice no man can be judge in his own case, however exalted his station [or] righteous his motives.").

In this case, ICE officers have grossly abused this authority – apprehending an individual for undefined reasons and then issuing an administrative arrest warrant and an NTA. ICE officers have done so unabashedly – they have openly admitted that they arrested the wrong man and that the administrative arrest warrant and related NTA

were issued *after* the arrest in question. Courts across the country have rejected and condemned this manifestly illegal practice by ICE officers.[6] That the authority to issue administrative arrest warrants emanates from a pending removal proceeding – which is initiated by the issuance of an NTA - renders this conclusion obvious.

The post-arrest administrative warrant was plainly invalid. *Castañon Nava,* 806 F. Supp. 3d at 841 ("any arrests made pursuant to these invalid Form I-200 warrants must be treated as warrantless arrests."). While immigration agents are authorized, under certain circumstances, to effect warrantless arrests of those "likely to escape before a warrant can be obtained," that claim has not and cannot be made here. 8 U.S.C.A. § 1357. Moreover, far from a circumstance in which the officers had some cause to effect an arrest, with respect to Garcia Lanza, who was legally authorized to live and work in the United States, the agents had *no* cause to arrest and imprison him.

> *Having Been Awarded Deferred Action Under his SIJ Status, Petitioner Was Not Subject to Removal and Had Been Effectively Paroled Into the United States*

---

[6]   *See, e.g., Gopie v. Lyons*, No. 25-CV-05229-SJB, 2025 WL 3167130, at *1 (E.D.N.Y. Nov. 13, 2025) (post-arrest issuance of administrative arrest warrant and NTA meant that "ICE arrested Gopie when they had no authority to do so"); *Castañon Nava v. Dep't of Homeland Sec.*, 806 F. Supp. 3d 823, 853-4 (N.D. Ill. 2025) (N.D. Ill. Oct. 7, 2025) ("ICE lacked statutory and regulatory authority to engage in its policy of issuing I-200 warrants to collaterals in the field without the concurrent or prior issuance of an NTA"); *Ramirez Ovando v. Noem*, No. 1:25-CV-03183-RBJ, 2025 WL 3293467, at *10–11 (D. Colo. Nov. 25, 2025) ("issuing post hoc warrants once plaintiffs had already been unlawfully arrested does nothing to cure the initial statutory violation"); *Maldonado v. Bostock*, No. 2:23-CV-00760-LK-BAT, 2023 WL 5804021, at *3 (W.D. Wash. Aug. 8, 2023) ("The parties provide no authority for the proposition that DHS retains discretion to sidestep or override Section 1225 by issuing an NTA and arrest warrant.")

USCIS approved petitioner's I-360 application, meaning that he had – and continues to have – SIJ status.  He was also the beneficiary of an unexpired four-year period of "deferred action" with concomitant work authorization, permitting him to live and work in the United States.  Guided by Supreme Court precedent and USCIS's policy manual, courts have repeatedly held that an unrevoked grant of deferred action prevents the removal of an SIJ recipient.  *See, e.g.*, *Nevarez Jurado v. Freden*, No. 25-CV-943-LJV, 2025 WL 3687264, at *9 (W.D.N.Y. Dec. 19, 2025) (citing *Sepulveda Ayala v. Bondi*, 794 F. Supp. 3d 901, 912-13 (W.D. Wash. 2025)).  In *Reno v. Am.-Arab Anti-Discrimination Comm.*, Justice Scalia defined deferred action to mean that "no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated." 525 U.S. 471, 484 (1999); *cf. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 9 (2020) (Roberts, C.J.) (noting that DACA recipients received "two-year forbearance of removal").  In its Policy Manual, USCIS states that "[a]liens granted deferred action are considered to be in a period of stay authorized under USCIS policy for the period deferred action is in effect."[7]  Petitioner's period of deferred action remains in effect.  Thus, simply put, his arrest and detention by ICE was illegal and in violation of his rights.

---

[7]    USCIS Policy Manual, Vol. 1, Part H, Ch. 2(A)(4), https://www.uscis.gov/policy-manual/volume-1-part-h-chapter-2.  [https://perma.cc/EFW3-J5FH].

The Government focused nearly all of its oversized brief[8] on whether petitioner was subject to mandatory detention under 8 U.S.C. §1225(b)(2)(A) as opposed to discretionary detention under 8 U.S.C. §1226(a), an argument rejected by nearly every court that has considered it.[9]  As in so many cases over the better part of a year, "[r]espondents have not offered any explanation for [petitioner's] detention other than their initial assertion that it is mandatory—that is, that it is non-discretionary." *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 495 (S.D.N.Y. 2025).  Yet in this case, the 1225/1226 distinction argument misses the mark entirely: having been awarded SIJ

---

[8]   That 34-page brief was filed based on the Government's representation that such was required to "adequately respond to the Petition."  DE 10.  That brief largely ignores the facts and dedicates less than two pages to relevant legal argument; the balance is a boilerplate screed with language befitting a high school term paper.  *See, e.g.* DE 11 at 11 ("Before 1996, Aliens Who Snuck Across the Border Had More Rights And Protections Than Aliens Who Presented At A Port Of Entry"); *cf.* DE 14 at 3 ("The fact that he was so successful in sneaking across the border that [*sic*] was not detained by [ICE] until what he alleges was decades after sneaking across, is not a basis for converting his lack of admission into benefits . . .").

[9]   Consider, for example, Judge Cogan's opinion in *Saamishvili v. Flanagan*, No. 25-CV-6178 (BMC), 2026 WL 377574 (E.D.N.Y. Feb. 11, 2026), one of the few cases in which the Government prevailed on this issue and hence one which respondents urge this Court to rely on.  DE 14 at 5.  Even if the undersigned were to agree with Judge Cogan's holding, the facts are readily distinguishable.  In *Saamishvili*, ICE had commenced removal proceedings against petitioner upon his entry into the country, issuing an NTA, and provisionally released him, subjecting him to periodic monitoring. 2026 WL 377574 at *1.  Thus, Judge Cogan concluded, "[s]ince his unlawful entry, petitioner has been, and continues to be, subject to the mandatory detention requirement of Section 1225(b)(2)(A)," which "could be satisfied by bond, check-ins, etc., but it could also be satisfied by physical custody, if the Executive chose to do so."  *Id*. at *3.  Thus, *Saamishvili* presents radically different facts: here, petitioner was not subject to removal proceedings or any type of ICE detention at the time of his arrest and detention, rather he had been granted SIJ status, a deferred action determination and work authorization.

status, deferred action and work authorization, and with no removal proceeding having been commenced, the petitioner simply was not subject to arrest.

Agents completing the NTA stated, as a basis for removal, that Garcia Lanza was "an alien present in the United States without being admitted or paroled…" DE 12-1 at 11. On this application, the Government advises this Court that "there can be no argument that ICE previously paroled Petitioner, constructively or otherwise." DE 14 at 7. While ICE did not parole Garcia Lanza, another branch of Government did: the United States Congress. Section 1255(h) of Title 8, United States Code, provides that an individual awarded SIJ status "shall be deemed . . . to have been paroled into the United States." *See Estuardo Xol-Maas v. Francis, et al.*, No. 26-CV-00025 (JAV), 2026 WL 457005, at *2 (S.D.N.Y. Feb. 18, 2026) ("SIJ beneficiaries are explicitly 'deemed ... to have been paroled into the United States for the purpose of this adjustment. 8 U.S.C. § 1255(h)(1).'"). "Congress clearly contemplated that SIJ designees would remain in the United States while awaiting adjudication of their adjustment of status applications." *Id.* at *7 (collecting statutory provisions); *cf. Osorio-Martinez v. Att'y Gen. United States of Am.*, 893 F.3d 153, 163 (3d Cir. 2018) ("Once attained, SIJ classification conveys a host of important benefits."). This legislative mandate has been incorporated into ICE's Policy Manual which provides that "the beneficiary of an approved SIJ petition is treated for purposes of the adjustment application as if the beneficiary has been paroled, regardless of the beneficiary's manner of arrival in the United States."[10]

---

[10]  See https://www.uscis.gov/policy-manual/volume-7-part-f-chapter-7#footnote-9 [https://perma.cc/239C-4RKW].

*The Warrantless Arrest of Petitioner, Along with the Retaliatory Revocation of his Grant of Deferred Action and Work Authorization, Violated his Due Process Rights*

Even assuming the Government could establish a discretionary right to arrest and detain petitioner, his arrest and detention violated the Due Process Clause, which protects non-citizens from arbitrary detention. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Trump v. J. G. G.*, 604 U.S. 670, 673 (2025); *Reno v. Flores*, 507 U.S. 292, 306 (1993). In this Circuit, the adequacy of the process provided in civil immigration confinement is determined through application of the *Mathews v. Eldridge* balancing test. *Valdez v. Joyce*, No. 25-CV-4627 (GBD), 2025 WL 1707737, at *3 (S.D.N.Y. June 18, 2025) (*citing Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020)).

The *Mathews v. Eldridge* factors overwhelmingly weigh in favor of finding that petitioner had a right to a pre-deprivation hearing prior to his arrest and detention. Garcia Lanza has substantial private interests in remaining out of custody, the risk of erroneous deprivation is considerable given the grant of SIJ status and deferred action and the erroneous assertion by ICE that petitioner should not be considered paroled into the U.S., and the government's interest in holding him without a hearing is low given that he has no criminal history, has significant community ties and employment as well as a documented history of complying with law and immigration directives. Thus, under the *Mathews* test, his arrest and detention, conducted without notice or a pre-deprivation hearing of any kind, was effected in flagrant violation of his Due Process rights. *McDonald v. Francis*, No. 25-CV-09355 (JAV), 2025 WL 3295906, at *3–4 (S.D.N.Y. Nov. 26, 2025) (In like circumstances, holding that "[t]he Court next considers

14

whether [ ] the Government violated Petitioner's due process rights. The Court easily concludes that it has.").

This analysis extends to the seemingly retaliatory revocation of the granted period of deferred action and work authorization. The substance of such discretionary determinations are well within the purview of the Executive branch, though, notably, these actions taken against petitioner contradict policies set by DHS. However, the manner, means and apparent motives for these determinations in this case renders them violative of the Due Process Clause. While immigration law provides for limited Due Process rights, such rights do exist. "Parties claiming denial of due process in immigration cases must, in order to prevail, 'allege some cognizable prejudice fairly attributable to the challenged process.'" *Garcia-Villeda v. Mukasey*, 531 F.3d 141, 149 (2d Cir. 2008) (quoting *Lattab v. Ashcroft*, 384 F.3d 8, 19 (1st Cir. 2004)).

Plainly, the grant of SIJ status, deferred action and work authorization constitute important benefits such that revocation would constitute "cognizable prejudice." *See, e.g. Zadvydas,* 533 U.S. at 690 ("[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects"); *Estuardo Xol-Maas*, 2026 WL 457005, at *2 ("Petitioner has established that his removal from the United States while he enjoys SIJ status but has yet to have the opportunity to apply for adjustment of status would violate due process"); *Nevarez Jurado v. Freden*, No. 25-CV-943 (LJV), 2025 WL 3687264, at *10 (W.D.N.Y. Dec. 19, 2025) (finding, under *Mathews* that "the government [does not have] free [rein] to detain a deferred action recipient without a pre-detention hearing or

15

individualized determination.").  It is USCIS policy that noncitizens "with current

deferred action based on their SIJ classification will generally retain this deferred action

until the current validity periods expire,"[11] and specifically provides that "the alien's

deferred action remains valid for the authorized period, unless terminated by USCIS."[12]

Moreover, the "process" undertaken by the Government here, to wit: revoking a

defined period of deferred action and work authorization following – and seemingly in

an effort to justify – ICE's patently illegal arrest and detention of petitioner, constitutes

arbitrary and capricious Government action incompatible with Constitutional norms.

> *The Government has Failed to Demonstrate that the Revocation Constituted a Valid Exercise of Discretion and the Undisputed Evidence Shows that Any Such Discretion was Exercised in an Unconstitutional Manner*

Respondents argue that the administrative arsenal unleashed against petitioner –

including the revocation of petitioner's deferred action and work authorization without

notice or a hearing – may not be considered by this Court because such actions were, in

the Government's explanation, an exercise of discretion.  Though provided ample

opportunity, respondents' counsel have failed to demonstrate that there was a valid

exercise of discretion or whether, when or by whom such discretion was in fact

---

[11]    USCIS Policy Alert, PA-2025-07, "Special Immigrant Juvenile Classification and Deferred Action" (June 6, 2025), available at: www.uscis.gov/sites/default/files/document/policy-manual-updates/20250606-SIJDeferredAction.pdf.  [https://perma.cc/V5GN-ZQ3Y].

[12]    *USCIS Policy Manual*, Volume 6 > Part J > Chapter 4, Adjudication > Section (G)(1). [https://perma.cc/H3WW-MYLY].

exercised.[13]  Perhaps respondents' efforts to document the process were stymied by the

lack of such a process.  Indeed, while respondents offered no evidence that discretion

was exercised, Government counsel submitted a brief containing this spectacular

description of USCIS's "process":

> USCIS "reserves the right to terminate the grant of [DA] . . . at any time as a matter of discretion," including where "USCIS determines the favorable exercise of discretion is no longer warranted." **There are no criteria that USCIS must consider in deciding whether to terminate deferred action.** *Id.* **There is no process that must be followed.** *Id.*

DE 14 at 9 (citing a superseded USCIS regulation) (emphasis added).

Even assuming respondents could demonstrate that the revocation represented

an exercise of discretion – though they have not – such discretion cannot be exercised in

a pretextual, discriminatory or arbitrary manner without running afoul of the

Constitution.

First, the revocation of Garcia Lanza's deferred action and work authorization

appears to have been pretextual and retaliatory: the only evidence as to the impetus for

these decisions was an effort to rationalize his illegal arrest and detention.  No other

justification has been offered by the Government.

Second, there is undisputed evidence of record that the arrest was motivated by

discriminatory animus.  In his sworn statement, Garcia Lanza averred:

> One officer asked me for identification, while another asked me, in Spanish, which country I am from and whether I have a green card. I responded in English that I had a work permit, and he took it from me.

---

[13]  As noted above, the only document suggesting that petitioner's deferred action had been revoked consists of a form letter from USCIS bearing a computer-reproduced signature.

*        *        *        *

> The only thing that mattered to these officers was that I looked Latino. The fact that upon their first interaction with me, they spoke to me in Spanish, confirmed to me that they only stopped me because I looked Latino and was walking in a predominantly Latino and Black area.

DE 12-1 ¶¶ 3, 5.  His counsel marshalled these arguments in her brief.  DE 12 at 2.

One piece of documentary evidence provided by respondents lends support to this notion.  The Certificate of Service on the hastily-prepared Notice to Appear appears, in part, as follows:



DE 12-1 at 12.  Except for signature blocks, the balance of the form was typewritten; here, the typewritten entry provides that Garcia Lanza's rights were provided to him in Spanish, while, as an afterthought, a slash and the word "English" inscribed by hand. Plainly, there can be no claim that the petitioner – who graduated college with honors in New York City, required his rights to be read to him in Spanish.  Yet that seems to have been the presumption, lending support to petitioner's assertions.

These are serious allegations supported by material evidence.  Recognizing the gravity of such claims, the Court, *sua sponte*, afforded respondents the chance "to contest any of the matters asserted or provide any further factual submissions." Electronic Order dated February 18, 2026; *cf. Batson v. Kentucky*, 476 U.S. 79, 93 (1986) (noting "the 'invidious quality' of governmental action claimed to be racially discriminatory.").  Confronted with these alarming allegations, and provided an

18

opportunity to respond, Government counsel offered no evidence. Instead, counsel filed another polemical brief that ignores these allegations of racial discrimination. DE 14. The *only* factual evidence submitted by respondents in this case consists of a single declaration of a Supervisory Officer who had no knowledge of the facts, and simply submitted information based on discussions with other unidentified officers and review of government records. DE 11-1.

Petitioner's evidentiary assertions of discriminatory animus remain entirely unrebutted. And, of course, the Constitution of the United States cannot abide such discriminatory acts. The specter of discriminatory animus buttresses a finding of Due Process violations.

Finally, it is difficult to characterize respondents' action in revoking Garcia Lanza's deferred action grant as anything but arbitrary and capricious. An agency's determination is arbitrary and capricious where it fails to "articulate a satisfactory explanation" for its actions. *See, e.g., Teleanu v. Koumans*, 480 F. Supp. 3d 567, 581 (S.D.N.Y. 2020). In this case, where the agency's *only* proffered justification for its action is that is has discretion to do so, the conclusion that its action is arbitrary and capricious becomes inescapable. Furthermore, by describing circumstances in which there is "no criteria that USCIS must consider" and "no process that must be followed," DE 14 at 9, respondents have invoked the very definition of arbitrary and capricious.[14]

---

[14] According to the Oxford English Dictionary, "arbitrary" relates to matters "not fixed[,] uncertain [and] varying"; while "capricious" denotes something "subject to change or irregularity, so as to appear ungoverned by law." See

The Government's assertion that judicial review is foreclosed under the APA was soundly rejected by the U.S. Supreme Court under like circumstances. In *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1906, 207 L. Ed. 2d 353 (2020), the Supreme Court squarely held that the recission of a two-year forbearance of removal pursuant to the Deferred Action for Childhood Removals, was subject to judicial review under the APA and was not precluded under the INA. And the Supreme Court rejected the agency's mass revocation of deferred action determinations, finding that "particularly when so much is at stake, that 'the Government should turn square corners in dealing with the people.'" *Id.*, 140 S. Ct. at 1909.

In sum, the actions taken against petitioner not only violate statutory and regulatory protections, but were pretextual, discriminatory, arbitrary and capricious so as to run afoul of constitutional protections.

*Representative Relief May Be Warranted*

In the petition, counsel for Garcia Lanza correctly note that "[t]he 'flexible nature' of habeas relief affords district courts significant discretion over the appropriate remedies for violations of law and the Constitution." DE 1 ¶49 (citing *Zumba v. Bondi*, No. 25-CV-14626 (KSH), 2025 WL 2753496, at *11 (D.N.J. Sept. 26, 2025) and *Velasco Lopez v. Decker*, 978 F.3d 842, 855 (2d Cir. 2020)). Indeed, the Second Circuit held that:

> The purpose of habeas corpus is to impose limitations on the
> Government's ability to do these things. Habeas corpus, as the Supreme

---

https://www.oed.com/dictionary/arbitrary_adj?tab=meaning_and_use#40209242 [https://perma.cc/VX82-T2KG],
https://www.oed.com/dictionary/capricious_adj?tab=meaning_and_use#10148147 [https://perma.cc/8LED-2T64].

> Court has said, is an "adaptable remedy," the "precise application and scope" of which changes "depending upon the circumstances." The equitable and flexible nature of habeas relief also gives the reviewing court considerable latitude.

*Velasco Lopez,* 978 F.3d at 855.

The facts developed in this case raise grave concerns that do not appear to be limited to this petitioner. A groundswell of caselaw responding to the recent onslaught of immigration enforcement efforts document troubling practices, while facts elicited in similar, ongoing cases have provided further evidence that the problems identified in these pages may be widespread.

Take, for example, the procedural infirmities regarding ICE's warrantless arrest of petitioner. Months ago, my colleague Judge Bulsara thoroughly examined this issue in *Gopie v. Lyons*, 2025 WL 3167130 (E.D.N.Y. Nov. 13, 2025) (holding that ICE officers were prohibited from using post-arrest administrative warrants and NTAs to justify warrantless arrests), a holding adopted by other opinions in this district. *See, e.g. Pesantez Castro v. Maldonado*, No. 25-CV-06844 (JMA), 2025 WL 3723966, at *1 (E.D.N.Y. Dec. 23, 2025); *Clarke v. U.S. Dep't of Homeland Sec.,* No. 25-CV-6773 (GRB), 2025 WL 3674471, at *2 (E.D.N.Y. Dec. 18, 2025); and *Arango v. Genalo*, No. 25-CV-6720 (RER), 2025 WL 3637500, at *2 (E.D.N.Y. Dec. 16, 2025). Despite a torrent of similar decisions from courts across the country, there seems to be little impact on respondents' practices.

This observation became more tangible during a February 2026 fact hearing in a similar case involving an individual with SIJ status, work authorization and deferred action grants, who was allegedly confused for a target, subjected to warrantless arrest,

detention and other retaliatory actions.  *Sanchez Alfaro v. Noem,* 26-CV-0766 (GRB).

During that hearing, three experienced immigration officers testified to training,

practices and policies implemented by ICE in connection with enhanced immigration

enforcement.  The testimony was nothing short of dumbfounding.

One officer with nearly 20 years' experience testified that after performing

"records checks" upon individuals stopped by ICE, officers can effect a warrantless

arrest and detention of anyone who is "amenable to removal proceedings."  Transcript

of Proceedings dated Feb. 25, 2026 ("Tr.") at 36.  The officer went on to explain that,

though no removal proceedings were pending, "[w]e could place them into removal

proceedings" and ICE arrests and detains individuals if "there is nothing prohibiting us

from placing them into removal proceedings."  *Id.*

This concept applies equally, according to the officer's training and experience,

to individuals holding a valid U Visa, SIJ status, Government-issued work

authorizations, recipients of deferred action grants and those who have been paroled.[15]

Tr. 40-49 ("people who have been paroled can be arrested" by ICE officers.).  With

respect to such individuals, the officer testified:

> So we just take them into custody, take them to the processing center and
> at the processing center they serve them with all the papers for the
> removal proceedings.

Tr. 38.  As to that petitioner's deferred action grant, the officer stated:

---

[15]  When asked to identify categories of immigration status that would prevent the
arrest and detention of a non-citizen, the officer could only name Temporary
Protective Status and Lawful Permanent Status.  Tr. 46.

it usually means we can't remove him at that time, you know, they won't be able to be removed from the United States *until we clear up that deferred action stating that this person can't be removed at that time.* But, like I said, we can still place him into removal proceedings.

Tr. 44 (emphasis added).

There seems to be a substantial disconnect between the practices, policies and training deployed by ICE, and the law. The abhorrent and illegal practices identified in this opinion are not limited to this case but are seemingly being inflicted on a widespread basis. Based on these developments, some form of representative relief may be in order. *See, e.g., United States ex. Rel. Sero v. Preiser*, 506 F.2d 1115, 1125-26 (2d Cir. 1974) (While Rule 23 does not govern habeas actions, the Second Circuit permitted a "multi-party proceeding similar to the class action"); *Martinez-Brooks v. Easter*, 459 F.Supp.3d 411, 451 (D. Conn. 2020) ("multi-party treatment avoids the 'considerable expenditure of judicial time and energy in hearing and deciding numerous individual petitions presenting the identical issue.'").

Counsel for petitioner may, if it deems appropriate, amend the petition to request such relief.

**Conclusion**

Based on the foregoing, it is hereby Ordered as follows:

1. The petition is granted provisionally pending further proceedings described herein;

2. The Court's previous order setting terms and conditions of release shall remain in effect until the resolution of all matters associated with

this case.  The parties may request modification of these terms and conditions upon good cause shown.  Any additional terms and conditions of release imposed by ICE were unauthorized and shall not be binding upon petitioner;

3. The purported revocation of petitioner's period of deferred action and work authorization, and the imposition of a fine, are deemed vacated and without force and effect.  ICE is directed to return petitioner's work authorization card forthwith;

4. Plaintiff's counsel is granted leave to amend the petition to seek representative relief within 15 days of the date of this Order; and

5. Any application for attorney's fees and costs under the Equal Access to Justice Act will be held in abeyance pending the conclusion of all proceedings in this matter.

Dated: March 3, 2026
     Central Islip, New York

SO ORDERED.

*/s/  Gary R. Brown*
GARY R. BROWN
United States District Judge